FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUL 10 2018 ★
BROOKLYN OFFICE

JMK:AES:PT/DCP
F.#2018R01217

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

US IMAGINA, LLC,

    Defendant.

- - - - - - - - - - - - - - - - - - - - X

INFORMATION

Cr. No. 18-311 (PKC)
(T. 18, U.S.C., §§ 981(a)(1)(C), 1349
and 3551 et seq.; T. 21, U.S.C.,
§ 853(p); T. 28, U.S.C., § 2461(c))

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION

At all times relevant to this Information, unless otherwise indicated:

I.   Background

    A.   FIFA

    1.   The Fédération Internationale de Football Association ("FIFA") was the international body governing organized soccer, commonly known outside the United States as football. FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland. FIFA was comprised of as many as 209 national member associations (also known as "federations"), each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories. The national associations promoted, organized and governed soccer, often including club-level soccer, within individual nations.

2. FIFA financed itself in significant part by commercializing the media and marketing rights associated with the World Cup, the sport's premier event.

3. FIFA first instituted a written code of ethics in October 2004, which code was revised in 2006 and again in 2009 (generally, the "code of ethics"). The code of ethics governed the conduct of soccer "officials," expressly defined by FIFA's statutes to include, among others, all board members, committee members and administrators of FIFA, as well as FIFA's continental confederations and member associations. Among other things, the code of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain. The code of ethics further provided, from its inception, that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of absolute loyalty. By 2009, the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues and clubs.

B.   <u>CONCACAF</u>

4. Each of FIFA's member associations also was a member of one of the six continental confederations recognized by FIFA. Among other things, the continental confederations organized the preliminary rounds, or qualifying matches, that national teams played in order to determine whether they would participate in the main World Cup tournament.

5. The continental confederation covering North America, Central America and the Caribbean region was the Confederation of North, Central American and

Caribbean Association Football ("CONCACAF"), which was incorporated as a non-profit corporation in Nassau, Bahamas. CONCACAF was comprised of as many as 41 member associations, including those of the United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands.

6. From approximately 1990 to 2012, CONCACAF's principal administrative office was located in New York, New York, where the former general secretary was based (until the end of 2011) and where CONCACAF regularly conducted business. Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida, where the new general secretary was based. CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation. In June 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

C. Regional Federations

7. In addition to being members of FIFA and their respective continental confederations, some of the member associations were also members of smaller, regional federations. For example, CONCACAF's member associations were organized into three smaller regional federations: the Caribbean Football Union ("CFU"), the Central American Football Union ("UNCAF") and the North American Football Union ("NAFU").

8. The CFU was comprised of dozens of national associations representing Caribbean nations and territories, including the U.S Virgin Islands and Puerto

3

Rico. At various times the CFU was headquartered in Trinidad and Tobago and in Jamaica. The CFU statutes effective May 22, 2012 provided, in pertinent part, that CFU officials "shall observe all pertinent statutes, regulations, directives and decisions" of FIFA, CONCACAF and the CFU, "including in particular . . . FIFA's Code of Ethics."

        9.      UNCAF was comprised of seven national associations representing Central American nations and was headquartered in Guatemala City.

        D.      <u>The Sports Marketing Companies</u>

        10.      FIFA, the continental confederations, the regional federations and the national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies and other events, as well as other rights associated with the sport. Often operating in coordination with affiliated consultants and intermediaries, these sports marketing companies, including multinational corporations with headquarters, offices or affiliates located in the United States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights and ticketing rights. These sports marketing companies often sold these rights to, among others, television and radio broadcast networks, sponsors and sub-licensees, including those located in the United States.

        11.      The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for FIFA,

4

other governing bodies and the sports marketing companies. Over time, the United States became an increasingly important and lucrative market for the commercialization of these rights, including the rights to World Cup qualifier matches for the CONCACAF region.

12. Since at least in or about 1998, the team designated as the "home team" for each World Cup qualifier match owned the media and marketing rights to the match. UNCAF and CFU member associations sought to generate revenue by, among other things, selling the media rights for their respective home World Cup qualifier matches. Each of the UNCAF member nations negotiated separately with prospective purchasers of the rights, such as sports marketing companies. Unlike the UNCAF member associations, the CFU member associations often banded together and negotiated as a group with prospective purchasers of these rights.

II.    The Defendant and Relevant Individuals and Entities

13. The defendant US Imagina, LLC (the "Defendant") was a privately-held company headquartered in the Miami, Florida area and organized under the laws of Florida. The Defendant had various business units, including a unit devoted to buying and selling the media and marketing rights to sports events, principally soccer. At various times the Defendant operated its businesses under different corporate forms and names and using subsidiaries and affiliated companies, including through the use of the trade name "Media World."

14. Imagina Media Audiovisual SL ("Imagina Media") was a privately-held company headquartered in Barcelona, Spain that was active in various aspects of the media

5

business in many countries around the world, including: the purchase, sale and exploitation of sports marketing rights; the production of original television and other audiovisual media content; and the production of sporting event television broadcasts. At various times, Imagina Media operated under different corporate forms and names, including "MediaPro." Imagina Media owned a controlling stake of at least 82.5% in each of the Defendant's various business units, including a unit devoted to buying and selling the media and marketing rights to sports events, principally soccer.

15. Medialuso was a wholly-owned subsidiary of Imagina Media organized under the laws of Portugal, where it was based. Medialuso's principal business was in the production of sports events for television.

16. Co-Conspirator #1, an individual whose identity is known to the United States Attorney and the Defendant, was a citizen of Spain and was one of Imagina Media's three effective co-Chief Executive Officers ("co-CEOs"), based in Barcelona, Spain. Co-Conspirator #1 was responsible for, among other things, managing Imagina Media's "international" business, meaning its business outside of Spain. Co-Conspirator #1 and Imagina Media's other two co-CEOs founded Imagina Media, and each of the three co-CEOs indirectly held an ownership stake in Imagina Media of more than ten percent. Co-Conspirator #1 sat on Imagina Media's Board of Directors.

17. Executive #1, an individual whose identity is known to the United States Attorney and the Defendant, was a senior Imagina Media executive, based in Madrid, Spain. Executive #1 reported to the three co-CEOs of Imagina Media.

6

18. Executive #2, an individual whose identity is known to the United States Attorney and the Defendant, was a senior executive of Medialuso, based in Portugal. Executive #2 reported to Co-Conspirator #1.

19. Roger Huguet was the CEO of the Defendant and in that capacity he reported to Co-Conspirator #1. During the relevant period, Huguet's employment agreement was with the Defendant. Huguet also indirectly held a minority ownership stake in the Defendant's business units, including a 17.5 percent ownership stake in all but one of the business units, and a stake of 7.875 percent in the other. Huguet was a dual citizen of the United States and Spain who resided in the Miami area. Huguet was removed as CEO of the Defendant on or about December 4, 2015, and was subsequently terminated by Imagina Media.

20. Fabio Tordin was a consultant to the Defendant from in or about and between 2009 and 2011. From in or about and between 2011 and 2015, Tordin was a senior executive at the Defendant. In both of those capacities, Tordin reported to Huguet and was responsible for the Defendant's sports marketing business, principally including its efforts to obtain the media and marketing rights to CONCACAF World Cup qualifier matches. Tordin was an agent of the Defendant with respect to the conduct described herein. Tordin was a Brazilian citizen and legal permanent resident of the United States who resided in the Miami area. Tordin was removed as an executive of the Defendant on or about December 4, 2015.

21. Miguel Trujillo was a licensed FIFA match agent and a consultant in the area of sports rights. Trujillo controlled companies and bank accounts located in the

7

United States and Panama, including shell companies located in Panama. Trujillo was a Colombian citizen and legal permanent resident of the United States who resided in the Southern District of Florida.

22. Sports Tournament and Rights was a Panamanian shell company owned and controlled by Trujillo.

23. Co-Conspirator #2, an individual whose identity is known to the United States Attorney and the Defendant, was a senior executive at Traffic USA, a sports marketing company based in Miami, Florida, from in or about and between the early 2000s and 2012. From in or about and between 2012 and 2015, Co-Conspirator #2 was the general secretary of CONCACAF. Co-Conspirator #2 was a citizen of the United States and Colombia and a resident of the Miami, Florida area.

24. At various times, Jeffrey Webb was the president of CONCACAF and a FIFA vice president and executive committee member from in or about and between 2012 and 2015. Webb also served on multiple FIFA standing committees, including the finance committee and the organizing committee for the World Cup. In or about 2012, Webb was the president of the Cayman Islands Football Association, a member of the CFU executive committee and the chairman of the CFU normalization committee, which was a committee that FIFA had put in place to run the CFU in 2011. Webb was a citizen of the Cayman Islands.

25. Costas Takkas was a chartered accountant and an associate of Jeffrey Webb. Takkas was a citizen of the United Kingdom.

8

III. **The Bribery Schemes**

    A. **Overview**

        26. Beginning in or about 2008, Huguet, Tordin and Co-Conspirator #1 engaged in a series of bribery schemes in order to obtain media and marketing rights to soccer matches from certain CONCACAF member associations. The schemes were planned in the United States, among other locations, and used the wire facilities of the United States to carry out the schemes, including by paying bribes from accounts at financial institutions in the United States. As part of these schemes, Co-Conspirator #1, Huguet and Tordin agreed to pay, and did pay, millions of dollars of bribes to high-ranking officials of several of CONCACAF's member associations and/or regional federations.

    B. **The CFU World Cup Qualifiers Scheme**

        27. Prior to approximately 2012, the Defendant, through its sports marketing division, and Traffic USA competed with each other to purchase the media and marketing rights for World Cup qualifier matches from CONCACAF soccer federations. Starting in or about March 2012, representatives of the Defendant negotiated with Co-Conspirator #2, who was then a high-ranking executive of Traffic USA, and others at Traffic USA and its Brazilian parent company, regarding the possibility of the Defendant and Traffic USA entering into a cost and revenue sharing agreement with respect to CONCACAF World Cup qualifier rights. Under such an agreement, the Defendant and Traffic USA would agree to share in a specific percentage of both the costs and revenues

9

associated with the purchase and exploitation of the media and marketing rights they obtained for CONCACAF World Cup qualifier matches.

28. In the course of these negotiations, Huguet and Co-Conspirator #1 learned from Co-Conspirator #2 that Traffic USA had already reached an agreement in principle with Webb, who was then the chair of the CFU normalization committee, to purchase the media and marketing rights to the CFU member associations' home World Cup qualifier matches for the 2018 and 2022 cycles. Huguet and Co-Conspirator #1 also learned from Co-Conspirator #2 that Co-Conspirator #2 had agreed to pay Webb a $3 million bribe in exchange for these rights. Co-Conspirator #2 further stated that, under the contemplated cost and revenue sharing agreement, the Defendant would be responsible for paying half of that bribe, $1.5 million, to Webb. By in or about August 2012, both Co-Conspirator #1 and Huguet were aware of the agreement to pay Webb a bribe, and they had agreed that the Defendant would be responsible for paying half of the $3 million bribe, or $1.5 million.

29. In or about April 2012, the Defendant and Traffic USA entered into the contemplated cost and revenue sharing agreement, which included the 2018 and 2022 World Cup cycles, but they did not disclose the existence of the agreement to outside parties. On or about August 28, 2012, the CFU and Traffic USA entered into a formal contract whereby the CFU sold to Traffic USA the media and marketing rights to the CFU federations' home World Cup qualifier matches for the 2018 and 2022 cycles. By the end of 2012, Traffic USA paid Webb its half of the $3 million bribe that the Defendant and Traffic USA had agreed to

10

pay. Traffic USA paid Webb this bribe through Takkas, Webb's associate, using shell companies and sham contracts to hide the true nature of the payment.

30. After Co-Conspirator #1 and Roger Huguet both were aware of this bribe agreement, Co-Conspirator #1 told Huguet to meet with Takkas to make arrangements for Takkas to receive the Defendant's share of the bribe payment on Webb's behalf. Co-Conspirator #1 also told Huguet that the Defendant's portion of the bribe payment would be made by Medialuso. Co-Conspirator #1 also directed Huguet to find an intermediary to receive the payment from Medialuso before sending the funds for Webb's benefit. In addition, Co-Conspirator #1 instructed Huguet to have the intermediary send a false invoice to Medialuso, and to include Executive #1 on the correspondence related to the false invoice to ensure that Medialuso would pay it.

31. Huguet later met with Takkas in Miami, Florida to arrange for Takkas's receipt of the bribe payment on Webb's behalf, including by identifying bank accounts and shell companies Takkas controlled. Huguet also contacted Trujillo, who agreed to use the Panamanian bank account of Sports Tournament and Rights, his Panamanian shell company, to function as an intermediary for the bribe payment. Under the agreement, Sports Tournament and Rights would receive the payment from Medialuso pursuant to a false invoice and transfer it to a different shell company, as directed by Takkas.

32. Co-Conspirator #1 then directed Huguet to contact Executive #2 in Portugal to arrange for Medialuso to make a $500,000 wire transfer for Webb's benefit.

33. In or about November 2013, Huguet contacted Executive #2 in Portugal to arrange for Medialuso to make that payment. The $500,000 wire transfer comprised a portion of the $1.5 million share of the bribe that Imagina US had agreed to pay to Webb.

34. In or about January 2014, Huguet and Trujillo prepared a false invoice for $530,000, which included the $500,000 bribe payment plus a $30,000 fee for Trujillo. The invoice was directed to Medialuso and was payable to Sports Tournament and Rights. Trujillo, through his brother, emailed the false invoice to Executive #1. Huguet thereafter called Executive #1 in Spain to bring the invoice to his attention, and asked Executive #1 to help facilitate Medialuso's making of the payment to Sports Tournament and Rights. Soon after receiving this call from Huguet, Executive #1 asked Co-Conspirator #1 about the invoice. Co-Conspirator #1 directed Executive #1 to pay the invoice, and informed him that Executive #2 was also aware of the invoice. Executive #1 worked to facilitate the payment because Co-Conspirator #1, who was one of his bosses, had instructed him to do so. Neither Huguet nor Co-Conspirator #1 informed Executive #1 or Executive #2 of the true purpose of the payment.

35. At around the same time, in or about January 2014, Co-Conspirator #1 called Executive #2 and told him that Medialuso would receive an invoice, that Executive #1 was aware of the invoice and that it was important for the invoice to be paid promptly. Executive #1, as he had been instructed by Co-Conspirator #1, thereafter forwarded the $530,000 invoice to Executive #2. Although Executive #2 understood the invoice billed to

Medialuso was for services Medialuso had not received, he arranged to pay the invoice because his supervisor, Co-Conspirator #1, had directed him to do so.

36. In March 2014, following numerous emails regarding the mechanics of the payment, personnel at Medialuso effected the $530,000 wire transfer to a Panamanian bank account for Sports Tournament and Rights that was controlled by Trujillo. Following further in-person meetings between Takkas and Huguet in Miami, Florida, Huguet directed Trujillo to transfer $500,000 from the Sports Tournament and Rights account in Panama to various other accounts for Webb's benefit, including a Florida bank account controlled by a Caymanian attorney, and a St. Vincent and the Grenadines bank account in the name of a shell company controlled by Takkas.

37. Around the same time this payment was made, Co-Conspirator #1 and Huguet learned that the U.S. Department of Justice was investigating the CEO of Traffic USA's Brazilian parent company and, as a result, agreed that they should not make any further payment towards the $1 million in bribes that the Defendant was still responsible for paying Webb. No further payments were made to Webb.

C. The UNCAF World Cup Qualifiers Scheme

38. In or about 2008, the Honduran soccer federation ("FENAFUTH") engaged Trujillo as an agent to sell its media and marketing rights to its home World Cup qualifying matches for the 2014 cycle. Trujillo negotiated with Huguet to sell these rights to Media World LLC, one of the entities comprising the Defendant. To obtain those rights for Media World LLC, Huguet agreed to pay Trujillo an inflated agent's commission, knowing

13

that a portion of the funds paid to Trujillo would be passed on to high-ranking FENAFUTH officials as bribes in exchange for their support for FENAFUTH's sale of these rights to Media World LLC. To hide the true nature of the payments, Huguet and Trujillo paid these bribes through the Panamanian bank accounts of a Panamanian company Trujillo controlled.

39. In or about 2009, Tordin was engaged as a paid consultant to the Defendant, and in that capacity he helped Media World LLC obtain media and marketing rights from certain CONCACAF member associations. Tordin thereafter negotiated contracts with the Guatemalan soccer federation ("FENAFUTG") and the Salvadoran soccer federation ("FESFUT") to purchase the media and marketing rights to those federations' home 2014 and 2018 World Cup qualifiers, respectively. To obtain those rights, in or about and between 2009 and 2011, Huguet and Tordin agreed to pay, and did pay, hundreds of thousands of dollars in bribes to high-ranking officials of FENAFUTG and FESFUT. To hide the true nature of the payments, Tordin routed the bribe payments through the Panamanian bank account of a Panamanian company controlled by an associate of Tordin.

40. In or about 2011, Huguet hired Tordin to work as an executive in the Defendant's sports marketing business in Miami, Florida, where he continued to be responsible for negotiating and obtaining for Media World LLC contracts for media and marketing rights held by CONCACAF member associations. Thereafter, in or about and between 2011 and 2015, Huguet and Tordin caused Media World LLC to enter into contracts with FENAFUTH, FENAFUTG and FESFUT to obtain media and marketing rights to those federations' 2018 and 2022 home World Cup qualifiers. To obtain those contracts, Huguet

14

and Tordin agreed to pay, and did pay, bribes to high-ranking officials of these three federations. Huguet, Tordin and Trujillo often disguised the true nature of the bribe payments with fake contracts and invoices, and by routing them through intermediary companies and foreign bank accounts, including the Panamanian bank accounts of companies controlled by Trujillo.

41. In or about 2012, the Costa Rican soccer federation ("FEDEFUT") sold Traffic USA the rights to the World Cup qualifier matches hosted by the Costa Rican soccer team for the 2018 World Cup cycle. In or about 2014, Huguet and Tordin learned that, rather than renewing its contract with Traffic USA to sell it the rights for the 2022 World Cup cycle, FEDEFUT was contemplating selling these rights to a company other than Traffic USA or the Defendant. At the time, FEDEFUT's sale of these rights to Traffic USA was in the Defendant's interest, because of the cost and revenue sharing agreement into which they had entered. Huguet and Tordin thereafter agreed to pay, and did pay, hundreds of thousands of dollars in bribes to a high-ranking FEDEFUT official to cause FEDEFUT to sell its 2022 World Cup qualifier rights to Traffic USA. Huguet and Tordin disguised the true nature of these bribe payments with fake contracts and invoices, and by routing them through the Panamanian bank account of Sports Tournament and Rights, before sending them to a bank account in the Southern District of Florida at the FEDEFUT official's direction.

42. Huguet regularly apprised Co-Conspirator #1 of the bribes paid on behalf of the Defendant to UNCAF officials to secure the rights to these federations' World Cup qualifier matches. Huguet and Co-Conspirator #1 also discussed the fact that the

15

Defendant had taken steps to conceal the true nature and purpose of bribe payments made in furtherance of the scheme, including by disguising those payments as fees payable pursuant to certain "consulting" contracts. Co-Conspirator #1 approved of the Defendant's participation in this scheme.

* * * *

43. The participants in these schemes often communicated by telephone and electronic mail between the Southern District of Florida and locations outside of the state of Florida in furtherance of the schemes, and traveled to Miami, Florida from outside the Southern District of Florida in furtherance of the schemes. Many of the bribe payments were made from the Defendant's bank accounts in the Southern District of Florida, and payments to the federations pursuant to contracts obtained with bribes were made from the Defendant and Traffic USA's bank accounts in the Southern District of Florida.

44. No disclosure of any of the foregoing bribery and kickback schemes was made to FIFA, CONCACAF, the CFU, UNCAF or any national soccer federation, including without limitation to their respective executive committees, congresses or constituent organizations.

COUNT ONE
(Wire Fraud Conspiracy - CFU World Cup Qualifiers Scheme)

45. The allegations contained in paragraphs one through 44 are realleged and incorporated as if fully set forth in this paragraph.

46. In or about and between 2012 and 2015, both dates being approximate and inclusive, within the Southern District of Florida and elsewhere, the defendant US Imagina, LLC, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF and national member associations and their constituent organizations of their respective rights to honest and faithful services of their officers through bribes and kickbacks, and to obtain money and property by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers, email messages and telephone calls, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
(Wire Fraud Conspiracy - UNCAF World Cup Qualifiers Scheme)

47. The allegations contained in paragraphs one through 44 are realleged and incorporated as if fully set forth in this paragraph.

48. In or about and between 2008 and 2015, both dates being approximate and inclusive, within the Southern District of Florida and elsewhere, the defendant US Imagina, LLC, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, the CFU and their constituent organizations of their respective rights to honest and faithful services of their officials through bribes and kickbacks, and to obtain money and property by means of one or more

17

materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers, email messages and telephone calls, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

49. The United States hereby gives notice to the Defendant that, upon its conviction of either of the offenses charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

50. If any of the above-described forfeitable property, as a result of any act or omission of the Defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the Defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK